Good morning, may it please the Court? My name is Monica Lattin, appearing on behalf of UST Global, Inc. I'd like to reserve four minutes for rebuttal. All right, watch your clock. B12, in the underlying case, pled a straightforward claim for breach of a 2014 Master Services Agreement. This is in the excerpts of record at 201, attaching the 2014 Master Services Agreement and nothing else in terms of contract. Acknowledged in the complaint that specific services had to be described in a separate statement of work and listing invoices that were issued pursuant to statements of work, claiming that non-payment of those invoices was a breach of the 2014 Master Services Agreement. Throughout the case, B12 cast this as an equitable claim, stating in their brief at 42 that UST Global was trying to reap the benefits of services without payment. That quantum merit claim was dismissed under statute of limitations. Under the contract on which it sued, the remaining contract, it was its burden to demonstrate that non-payment for services breached this particular agreement. In doing so, it was required to rely on separate contracts that admittedly, by all parties, make no reference to the 2014 Master Services Agreement, and therefore relying on legally irrelevant testimony, parole evidence, seeking to vary the terms of those intervening contracts and failing to connect the necessary contractual dots to show that the non-payment of the invoices, as they proceed through the statement of work, constitute a breach of the separate agreement. Your original motion, did you argue that the judge improperly admitted parole evidence? Yes, Your Honor, we, in our 50A motion and 50B, we alleged that there was no legally sufficient evidence, and the court noted that we had preserved the evidentiary objection to parole evidence, but in the JMOL order itself, the court noted preservation of error on the objection at trial, and I would note that the questions of law are not required to be preserved in a 50A motion. Our observations about parole evidence is that they are a legal nullity, my words, that they, as a matter of substantive law, have no effect on the contract claim. So our 50A motion, which was there was no legally sufficient evidence, then of course can go on to address why there's no legally sufficient evidence, for example, parole evidence, for example, testimony lacking a legal foundation. So we're applying California law here, right? Yes. So California law has a parole evidence rule that I find kind of counterintuitive, but as I understand it, extrinsic evidence can always be introduced initially to show that seemingly clear language actually has a latent ambiguity. And I don't understand how that isn't applicable here. I know you're saying there shouldn't be parole evidence, but it seems like you're pointing to language that suggests some other agreements were the real agreements that this is about, but there's no evidence those agreements exist. And so if there's no evidence those agreements exist, I think you can use parole evidence to say there's a latent ambiguity about what was being referred to here. Thank you, Your Honor. The ambiguity issue below that was raised by B-12 was a very narrow one, and that issue that was submitted to the jury on ambiguity only related to 33 invoices of the 73 media services invoices. The argument of ambiguity that the court allowed to go to the jury was only an issue about the time frame of the statements of work, which I can address that bucket, but it does not address the larger issue, which is that the 2014 Master Services Agreement says it's a complete agreement, and that statements of work executed here under become part of that. So it was B-12's burden to prove that the statements of work were executed here under. B-12 pointed to the statements of work as the actual documents pursuant to which the The invoices, they say, tie to these statements of work. But the face of those statements of work do not evidence an intent to be executed here under the 2014 MSA. And Mr. Botticelli's... But I guess that's what I'm saying. The language of those, maybe there's this latent ambiguity that parole evidence can be used to sort out. What B-12's contention was at trial was that it was an error. Repeatedly throughout was that the statements of work were a mistake, that it was a mistaken reference, and B-12 never sought the legal avenue to correct that, keeping in mind that under PG&E, an ambiguity argument has to give rise to an interpretation that the document is reasonably susceptible to. And the statements of work are not reasonably susceptible to an interpretation, which is all parole evidence can do. But if they, I mean, you don't have evidence of what agreement you're saying they are about instead, right? And B-12 improperly tried to shift that burden to UST Global. It was B-12's burden, B-12 could have sued on the statements of work. Statements of work are contracts, they're fully executed. B-12 wanted to claim that the nonpayment of invoices under those statements of work constituted a violation of the Master Services Agreement. It was B-12's burden to produce legally sufficient evidence that those invoices were governed. And the sole testimony was, it was a mistake, the statements of work should have referred to a different agreement. Parole evidence is not permitted to vary the terms of a contract. That's where you get into the doctrine of mistake, should they have chosen to pursue that. Well, I think it is, though, if, I mean, what a latent ambiguity is, is something that, like, wouldn't be obvious unless you look at the parole evidence, and this is where I think California law is very hard to understand, but I think it is California law, that you can look at whether such an agreement exists in the world to figure out, oh, even though it says something, it must not have really meant it. I understand the point, and I understand the breadth of parole evidence rule under California law, but that's what the doctrine of mistake is. And the case about, that we cited in our briefs about, you cannot say that, I'll say, a pen is a pencil, that's not a solution to ambiguity, because, again, the evidence of parole evidence has to give rise to an interpretation to which the contract is reasonably susceptible. And that's, that was the burden of proof, not UST Global's obligation to come back and negate it, keeping in mind they're suing on invoices that are issued to different entities that tie into a contract that makes no reference. And there was evidence in the record that there were multiple contracts, signed and unsigned, we know you can sue on unsigned contracts, you can make equitable claims, but there was no legally sufficient evidence to tie those statements of work to evidence that the parties intended for those statements of work to be incorporated into the Master Services Agreement. And the problem was- So do you have an explanation of what those statements of work, I mean, I don't think you dispute the work happened, and there are the statements of work, so I don't really understand what you think they were about, because you haven't shown some other agreement that had some other terms that you're really talking about. Sure. And, Your Honor, and I, hypothetically, you have statements of work that the parties executed, and they recite who the parties are to the agreement, and I do need to come back to Spain in terms of who the party even is to that agreement. And you discover that they point, you know, it's only the payment terms that are incorporated into the statement of work. And you point to some document, and you say, oh, the payment terms are over here, the payment terms are on a napkin that we sketched out in a bar, the payment terms are in this document on the internet, the payment terms are this agreement. If that was a hole in the statement of work, that would be law relating to the statement of work. The law would look at the statement of work and say, well, if there's a failure of this term, then there are legal doctrines about where you go look to fill in that term. That is a separate issue from evidence of intent to take that fully executed agreement and incorporate it into the 2014 Master Services Agreement, which says only statements of work executed here under, remember, there's a form, and there's a way to do that, or the face of the document could show it. That's the failing for the contract they sued on. I can think of lots of ways you could have sued on the invoices themselves, could have sued on the statements of work, saying, oh, we have a hole in the statement of work, we need to fill that. But it is a separate issue because of the way they pled this so narrowly that let them sue in California, in this court, by saying, well, it's all supposed to be, it's all supposed to be the 2014 Master Services Agreement, which would just throw the doctrine of mutual mistake out the window. The doctrine of mutual mistake, which lets the parties vary the plain language, but you have to show, by clear and convincing evidence. Did you introduce any affirmative evidence that the Spain and media SOWs were not governed by the 2014 MSA? Yes, the statements of work themselves not only fail to evidence an intention to be bound under the 2014 Master Services Agreement, they point to some other terms. Let's just say whatever those terms are. And so the statements of work themselves, which are contracts that B-12 cannot vary, those contracts themselves are evidence that the parties did not intend to, remember, incorporate these into this separate document, which has the whole point of it is a carefully constructed way so that you know when services are under the Master Services Agreement, what does that look like? It's a statement of work in the form attached as Exhibit A. Now with regard to Spain, that problem dooms all of the invoices, but with regard to Spain, which I'll point out, 229 of the invoices at trial were Spain invoices, 73 of them were media services. The Spain invoices totaled $1.129 million, 75% of the judgment. With regard to the Spain, it's important to additionally note that Mr. Bhattacharya admitted at Excerpt of Record 584 that UST Global Inc. was not a party and had no stated obligation under that statement of work. As a matter of law in the statement of work, you're not just talking about whether the Master Services Agreement is incorporated, you're talking about who is the party. It says UST-Spain, and it shouldn't matter who drafted these documents. There's no contra-proferentum issue in this case, but the Spain statements of work are all on B-12 letterhead, all prepared by Spain, showing UST-Spain as a subcontractor. Going back to just what Master Services Agreement was being referenced, say that the statements of work had the date of the 2014 Master Services Agreement, but with just either one day off, like it was January 11th, 2014, and they wrote January 12th, or maybe it's 12th and they wrote 21. I mean, if it's a tiny typo, is your position that at that point it's not enforceable? It's the same argument, because it's referring to something that doesn't exist. I think it would be relatively easy to plead mutual mistake. You plead your Master Services Agreement, you plead your statements of work, you plead mutual mistake, you take... But you're still saying they would lose in that case because they didn't do mutual mistake. Like basically that would be the same case in your view. I don't know that I've thought about where the line would be, Your Honor, but I believe given that you have to vary the contract, and this contract is a bridge to the 2014 Master Services Agreement, that I think it is a problem that it is not in the form. But I think that is much closer to a typo than some completely different date, and particularly with Spain, which I would just note that not only as a matter of law is UST Global Inc. not a party to that agreement, as a matter of fact, Mr. Bhattacharya's testimony was that he did not know who signed it. And if you do not know who signed it, you can't have a foundation for the testimony that the signatory was an authorized representative of UST Global Inc., which is stated in Section 1A. Statement of work must be signed by an authorized representative. Signature by an unauthorized representative is not. So first of all, you're into your four minutes that you wanted to reserve, but secondly, you made all these arguments to the jury, and they ruled against you. Yes, and that is right, Your Honor. These are legal problems. These are errors of law that attempting to vary the terms of the contract with no legally sufficient evidence of authority as to Spain. When you say, I don't know who signed it, you cannot then be saying that the person was authorized. Right. Do you want to reserve? You have a minute and a half. Thank you. May it please the Court, Thomas Allen here with my colleague Ariel Fox on behalf of In his order denying UST Global Inc.'s renewed motion for judgment as a matter of law, that's the order they purport to challenge in this court but never actually appealed, Judge Selna correctly recognized that UST's arguments, in the end, boil down to a fundamental disagreement with the jury's verdict. Now the record shows this was a verdict that was reached after three days, where one witness testified, Mr. Shovak Bhattacharya, B-12's founder and managing consultant. Mr. Bhattacharya testified to every element of B-12's breach of contract claim as allowed by California law, and UST Global Inc. called no witness to contradict anything he said. The jury believed Mr. Bhattacharya, as it was entitled to do. The jury rendered verdict for B-12 and awarded damages, not as some disguised claimant equity, as UST argues now, but under black-letter California law. Before I dive into that, I want to pause momentarily and note that we have raised an issue about this court's jurisdiction. In our view, the court need not and should not even reach UST's first issue on appeals. It's obvious that, from the opening brief, that they're trying to contest this order, and you've responded, so there's no prejudice, and I think we have case law saying that when it's very obvious what they're trying to do, we construe it that way, so I'm not sure this is a good argument. Well, I understand, Your Honor. I understand that you probably don't want to waste your time on it. I understand your, well, on that note, Your Honor, I will move along to discussing the merits and the issues that were raised here. As I noted, this was a jury argument, this was a jury verdict. Mr. Bhattacharya testified at length. But why should it have gone to the jury at all? I mean, why wasn't this just, you've sued under some document that doesn't seem related to the proof of the work at all? Your Honor, that really goes to the heart of the dispute here, and I think that can be answered by reference to the special verdict and to the plain language of the Master Services Agreement itself. The Master Services Agreement that we read about in the briefs talks about the statements of work. Section 1A describes the statements of work itself and says, those shall be prepared. Doesn't say who, but it says they shall be prepared. Similarly, with regard to the invoicing, the Master Service Agreement at Sections 5A and 5B says that B-12 will invoice UST Global per a schedule. It will use UST's invoicing system or otherwise follow UST's instructions. The key here is that something that shall be prepared under a contract, something that will be done under a contract, is a matter of performance under the contract. And so the question is, did B-12 perform? That was the question submitted to the jury. It was question number three of the special verdict, and the language of that question bears repeating. The jury was asked, consistent with California law, did B-12 do all or substantially all of the significant things the contract required it to do? The jury answered yes. UST did not object to that question, and UST on appeal does not challenge the sufficiency of the evidence supporting the jury's finding. As I mentioned, this is entirely consistent with California law, which says that in the context of services contracts, the law does not require strict compliance with the terms of the contract, but rather follows the substantial performance doctrine. That is why this is not an equitable claim masquerading as a breach of contract claim. It is California law. And so under that framework, Mr. Bhattacharya testified without contradiction as to all of the issues that UST Global raised. With regard to the statements of work, for example, he testified that the most important thing that had to be done was that an individual statement of work be prepared for every contractor. That happened, undisputably. And he testified, though, because of UST's rush, the urgency with which they wanted contractors to be dispatched to clients, that other issues, even errors in the naming the contract, the or maybe not at all. Those were the significant things under the contract that was B-12's responsibility to do in order to get paid. And the jury found, and it is not challenged, that B-12 did every single one of those things. The invoices, he told a similar story. He testified, again, without objection. UST never rejected any of B-12's invoices, even if they contained errors in dates. What was the stated reason for not paying the invoices at issue? Well, the record reflects that there was an ongoing discussion about that. And in fact, though, during that discussion, this is the Exhibit 20 that is referenced in UST's second issue on appeal. We introduced that at trial as evidence of UST acknowledging its debt under these invoices. And there is a dispute about that evidence, the probative value of it, most of which goes to the weight of that testimony and that exhibit, rather, not its admissibility. It was only after, and this was at trial, it was only after B-12 filed suit that suddenly UST said, you know what, we don't have to pay these invoices at all because there is a mismatch. And they, or this particular statement of work references a master services agreement that is undisputed, never existed. And the jury was entitled to hear that. And this leads me to the question of burden of proof. Yes, Your Honor. It's just very odd. I mean, usually, if you're going to do work, then you try to make sure you have a contract that says you're going to get paid. And if you somehow mess that up, then you can say there's been unjust enrichment or some equitable thing. But it seems like you missed the time deadline for that. So now you're trying to piece together, like, I still had a contract, but it's very hard to piece together this contract. Well, Your Honor, that's why I would submit that we have to look at this under the framework of Question 3 and the Doctrine of Substantial Performance. UST said that we are trying to throw out a doctrine. They are trying to move as far away as possible from the jury's answer to Question 3 and the Doctrine of Substantial Performance. Again, the internal documentation of the work was something that had to be performed under the contract. And so... I just want to make sure I understand your argument. You're saying that the Master Services Agreement is the contract that's being enforced, and how would you characterize the SAWs? Well, the SAWs are attachments to that contract. And they describe the work. And the dispute here was... Are they contracts, or are they something else? Well, they are... We don't... We did not sue for breach of the Statements of Work. We sued for breach of the 2014 Master Services Agreement, which contains UST's obligation to pay. And so one of the arguments that UST makes, and my friend, Ms. Ladin, was making earlier, is that they want to put a lot of weight on Section 17 of the Master Services Agreement. This is a merger clause, and it contains the executed here under language we heard a bit about before. And in that sense, it's true. A merger clause does define the outer limits of a party's agreement. But what it doesn't do is transform the performance of a contract into some other contract formation question that can, therefore, obviate the substantial performance doctrine under California law. But that's exactly what UST is arguing. According to them, the only way its payment obligation is triggered is if the SAWs are prepared without any errors or technical defects of any kind, but that's not California law. That's not the question that was asked to the jury. It's not what the Master Services Agreement itself says. So if I could switch gears for a moment, the question, how did the jury know that the invoices arose under the 2014 MSA when they said things like UST España, UST Media Services? Well, and that goes to counsel's connect-the-dots point. The jury was entitled to draw that inference from a couple of sources, the documents themselves, Mr. Gbadacharya's uncontradicted testimony. He testified that those designations were errors, and there was lengthy testimony about this and the circumstances under which those errors arose. But he also testified that the 2014 MSA, the contract we sued under, was the only contract for which these invoices were submitted. He noted that there were other invoices, I believe in Exhibit 21, that contained similar errors and were paid. So that was one portion of the evidence. Another was the absence of contravening evidence, and I believe that was going to your question, Judge Wardlaw, earlier. UST, as part of its defense, tried to impeach Mr. Gbadacharya's testimony, but they also asked the jury to believe something different. They asked the jury to believe that there were other arrangements with other entities. But was there any evidence as to that? Was there any evidence as to the 2015 supposed MSA? No, Your Honor. There were Exhibits 23 and 24 that UST discussed as potential candidates for that. But neither of those match up either. It's not like there was an example of this other phantom MSA out there that actually answered the question of which one of these... Was it another candidate as the contract governing these invoices? It was not. And so the jury was entitled to... Yeah, it seems like the trial was rather one-sided. Well, there was only one witness. And you could... I suppose a reasonable jury could conclude, well, this is... They put on evidence of this. There's no evidence to the contrary, so we'll go that way. I mean, I don't think that would be unreasonable for the jury to do. I agree, Your Honor. Because UST... But that's not the only thing they could have done. They could have found Mr. Bacharya lacked credibility. They could have. And that was their exclusive province as the fact finder. But the jury did believe him. And the jury was entitled to not believe UST's alternate hypothetical scenario because that story, if it were true, would be pretty easy for them to prove. They could have called someone to testify and say, actually, these statements of work were governed... These invoices were governed by a different master services agreement. They could have introduced other contracts. They didn't. And so the jury was entitled to infer from the absence of any of that evidence that Mr. Bacharya was credible. Mr. Bacharya's account of what happened was credible, and therefore they believed him. Now, this does not attempt to flip the burden of proof. I feel like I must address this briefly. To be clear, we are not saying that UST as defendant bore a burden of proof. B-12 was the plaintiff. B-12 bore the burden of proof. B-12 met its burden of proof. But as we were discussing a moment ago, UST, as in asserting its defense, did not call any witnesses. It attempted to impeach Mr. Bacharya's testimony and credibility, and then it asked the jury to believe a different story. If UST wanted the jury to believe that different story, then they needed to substantiate it. But the jury, as you say, Judge Wardlaw, was entirely entitled and within its rights to disbelieve that story based on the absence of that evidence. If I might, I might switch gears and address very briefly the other two issues that UST has raised in its brief with regard to the redacted email exhibit. There was no abuse of discretion here. Among other reasons, as we explained in the brief, UST itself moved to exclude evidence of unrelated disputes and cannot now assert an abuse of discretion when the trial court did essentially what it asked them to do, what they asked him to do. This redacted information does concern separate disputes with another B-12 entity. It's irrelevant, and so there was no abuse of discretion. Similarly, with regard to closing argument by a B-12's trial counsel, that argument was entirely fair game, criticizing, again, this alternate theory of other contracts with other entities. And Judge Selma had a front row seat to the entire trial. He was best equipped to assess any potential prejudice or errors and acted well within his discretion. So in the end, I would leave the court with where I began. The jury was entitled to believe Mr. Bhattacharya, the only witness to testify, no matter how much UST disagrees. The jury was entitled to reject this alternate theory because there was no evidence to support it. And though their argument is wrapped in the mantle of fidelity to the text of the contract, the plain language of the contract, UST asks this court to second guess and intrude onto the jury's province as fact finder. We would respectfully submit the court should decline that invitation. And if the court has no other questions, I will simply close by saying for these reasons and those stated in our brief, we respectfully request that the court affirm the judgment below. Thank you. Thank you, counsel. Ms. Flaten? Thank you. This case is not about whether services were performed and invoices were submitted or even approved, though we challenge the sufficiency of the evidence of that. The question is, Mr. Allen suggests that B-12 had no burden, that Mr. Bhattacharya could just get on the stand and say whatever he wanted to, and if no one controverted that, they win. That's not the law. B-12's burden was to adduce legally sufficient evidence, and by relying on parole evidence and testimony without foundation, B-12 failed to meet its burden that the contract they chose to sue on was violated by nonpayment of the invoices. We cited the KST case as a good example. If you're going to incorporate a document into another one, it must be clear. We cited Tahoe National Bank in Casa Herrera, black-letter law about parole evidence. These statements of work are contracts. There is no doubt they are intervening contracts that are the bridge that, when fully executed by an authorized signatory, are a bridge to the 2014 MSA. These contracts must be varied for B-12 to win. There was no ambiguity testimony permitted about anything other than 33 invoices on the invoices that don't even reflect a statement of work where UST Global Inc. is a party and invoices are addressed to an entity in Spain to suggest that nonpayment of those invoices lets the jury just conclude, well, ha, they must arise under the 2014 Master Services Agreement. That's the legal gap that caused B-12 to fail to meet its burden of proof asserting the wrong claims in this case, and we ask that the judgment be reversed. Thank you very much, Counsel. B-12, Consulting v. UST Global is submitted, and the court will be in recess for five minutes. All rise. This court stands in recess for five minutes.
judges: WARDLAW, FRIEDLAND, SUNG